OPINION
Appellant, Benjamin D. Hudach, appeals from the judgment of the Trumbull County Court of Common Pleas, which denied appellant's petition for postconviction relief without a hearing. For the reasons that follow, we affirm the judgment of the trial court.
Appellant was indicted by the May 1995 Term of the Trumbull County Grand Jury on five counts. Count 1 alleged that appellant committed aggravated murder with prior calculation and design in violation of R.C. 2903.01(A) with specifications of aggravating circumstances under R.C. 2929.04(A)(2), (A)(5), and (A)(7). Count 2 alleged that appellant committed aggravated murder while committing or attempting to commit or while fleeing immediately thereafter the commission of aggravated burglary, in violation of R.C. 2903.01(B), with specifications of aggravated circumstances under R.C. 2929.04(A)(2), (A)(5) and (A)(7). Both counts identified Ann Serafino as the victim.
Count 3 alleged that appellant committed attempted aggravated murder in violation of R.C. 2923.02 and 2903.01(A), with a firearm specification. Count 3 identified Charles Serafino as the victim. Count 4 alleged that appellant engaged in a conspiracy to commit aggravated murder in violation of R.C. 2923.01(A)(1) and/or (2). Count 4 named both Ann and Charles Serafino as the victims. Finally, Count 5 alleged that appellant committed aggravated burglary of the residence of Ann Serafino in violation of R.C.2911.11(A)(1) and/or (2) and/or (3), also with a firearm specification.
The charges stemmed from the murder of Ann Serafino and the attempted murder of her son, Charles Serafino, during the early morning hours of July 7, 1995 at the Serafino residence in Trumbull County. According to the state, appellant was one of four persons responsible for the murder of Ann Serafino, the attempted murder of her son and the aggravated burglary of the Serafino residence.
Two court-appointed attorneys represented appellant below. He pled not guilty and the matter was ultimately set for trial on September 3, 1996. The record reveals that defense counsel zealously sought discovery in preparation for trial and otherwise diligently defended appellant's interests during the pre-trial proceedings.
On the trial date of September 3, 1996, appellant appeared before the court to plead guilty to an amended indictment pursuant to a plea bargain with the state. In exchange for appellant's cooperation and testimony against his alleged co-conspirator, John Santine ("Santine"), the state agreed to move the court to dismiss all specifications in the indictment and to dismiss Counts 2 and 4 of the indictment. Appellant entered both written and oral pleas of guilty to aggravated murder, complicity to attempted aggravated murder and complicity to aggravated burglary.
The record before this court contains a transcript of the plea hearing. After the requisite Crim.R. 11 exchange, whereby the trial court personally addressed appellant and advised him of his rights pursuant to Crim.R. 11, the trial court accepted appellant's guilty pleas. The state thereafter advised the court of the factual basis of the plea.
According to the state, there was extensive evidence to prove that Santine offered appellant and his two co-defendants, Richard McNulty ("McNulty") and Jason Getsy ("Getsy"), $5,000 to kill Charles Serafino and any witnesses. This evidence would further show that pursuant to this murder-for-hire scheme, appellant and his co-defendants prepared the murder weapons by cleaning them to hide any fingerprints; dressed up in camouflage and proceeded with Santine to the Serafino residence. In their possession were three weapons, Santine's cell phone and appellant's pager.
After Santine dropped off the three near the Serafino residence, appellant told his fellow co-conspirators that he hurt his ankle. Thus, he remained behind some dirt piles to act as a lookout for the other two. Appellant allegedly gave his weapon and his pager to McNulty. McNulty and Getsy then proceeded to the Serafino residence. Once they arrived at the residence, the state claimed the testimony would be that appellant used the cell phone to send a message of "666" to his pager which McNulty was carrying. This "message" was supposed to signal that the coast was clear. McNulty and Getsy thereafter forcibly entered the Serafino residence, shot and killed Ann Serafino and seriously injured her son, Charles Serafino.
After hearing the gunshots from his hiding place, appellant allegedly telephoned Santine on the cell phone to inform him that the job was done. McNulty and Getsy returned and the three fled to McNulty's apartment, discarding the weapons along the way. At the apartment, appellant and his co-defendants took baths and discarded their clothing. Appellant, McNulty, Getsy and Santine then discussed what had transpired. Santine offered to pay the three $10,000 at this point, but appellant apparently declined the offer, stating that it was a personal favor for Santine. The state indicated that it had two witnesses who would testify to overhearing appellant making this latter statement, McNulty and one Josh Koch ("Koch").
Later on the day of the shootings, the state again claimed that appellant was overheard discussing the shootings. The state offered that appellant was overheard telling Matt Bartlett ("Bartlett"), that "he had done it last night, that he killed someone, that it was a rush." The state offered that not only would it put into evidence the testimony of the various witnesses who overheard the plans for the murder-for-hire scheme, but it would also offer the witnesses who overheard the incriminating after-the-fact statements made by appellant. The state would also put into evidence records of the cell phone and pager at issue to support its claim that appellant used the cell phone and pager in furtherance of his role as a lookout. Finally, the state indicated that it was prepared to call at least seventeen additional witnesses, including Bartlett.
Although defense counsel disputed some of the state's characterizations of appellant's level of participation, counsel acknowledged that appellant did participate in the scheme and that appellant was willing to accept responsibility for his participation. Appellant did not proclaim his innocence at the plea hearing.
On September 5, 1996, the trial court sentenced appellant to a term of twenty years to life on the aggravated murder charge, with the possibility of parole after appellant served twenty years; an indefinite term of ten to twenty-five years for the attempted aggravated murder charge and an indefinite term of ten to twenty-five years on the aggravated burglary charge. The sentences were ordered to run concurrently.
On March 27, 1997, appellant filed a petition for postconviction relief in the trial court. In the petition, he alleged that his guilty pleas were not made knowingly, intelligently and voluntarily because he was deprived of the effective assistance of counsel. He requested an evidentiary hearing on his petition. The state filed a motion to dismiss the petition and appellant responded. The trial court found no merit to the petition and denied it without holding an evidentiary hearing on appellant's claims.
Appellant perfected a timely appeal, asserting three assignments of error for our consideration:
 "[1.] The trial court erred to the prejudice of defendant-appellant by refusing to hold an evidentiary hearing on defendant-appellant's motion for post-conviction relief.
 "[2.] The trial court erred to the prejudice of defendant-appellant by denying his motion for post-conviction relief on the grounds of ineffective assistance of counsel.
 "[3.] The trial court erred [by] denying defendant-appellant's petition for post-conviction relief on the grounds that defendant-appellant's plea was not knowingly, voluntarily and intelligently made."
As appellant's assignments of error share a common basis in law and fact, we will address them in a consolidated fashion. Appellant argues that the trial court erred by overruling his petition for postconviction relief without first holding an evidentiary hearing because he supported his petition with sufficient evidentiary material entitling him to a hearing on his claims. In the alternative, he contends that he was entitled to postconviction relief on the face of his petition.
R.C. 2953.21(C) and (E) govern the grant or denial of an evidentiary hearing on a petition for postconviction relief in Ohio. R.C. 2953.21(C) states:
 "* * * Before granting a hearing, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition and supporting affidavits, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript."
R.C. 2953.21(E) further provides: "[u]nless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues * * *."
In a decision of this court in State v. Allen (Sept. 23, 1994), Lake App. No. 93-L-123, unreported, we held that a hearing is not automatically required whenever a petition for postconviction relief is filed. The test is whether there are substantive grounds for relief that would warrant a hearing based upon the petition, the supporting affidavits, and the files and records in the case. State v. Strutton (1988), 62 Ohio App.3d 248.
When a petition for postconviction relief asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness. State v. Jackson
(1980), 64 Ohio St.2d 107, syllabus. In the context of a plea bargain, the petition is subject to dismissal without a hearing when the record, including the Crim.R. 11 dialogue, reveals that the petitioner is not entitled to relief, and the petitioner has failed to submit evidentiary documents containing sufficient operative facts to demonstrate that the guilty plea was coerced or induced by false promises. State v. Kapper (1983), 5 Ohio St.3d 36,38. The holding in Jackson is based, of course, on the two-prong test for ineffective assistance of counsel first set forth by the United States Supreme Court in Strickland v.Washington (1984), 466 U.S. 668. The Strickland test has been followed and applied by the Supreme Court of Ohio and this court.State v. Post (1987), 32 Ohio St.3d 380; State v. Bradley (1989),42 Ohio St.3d 136; State v. DiMeolo (Sept. 30, 1992), Ashtabula App. No. 91-A-1680, unreported, 1992 Ohio App. LEXIS 5045.
Under the first prong of the test, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland at 687. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Id. In the context of a plea bargain, the defendant must show that, but for counsel's errors, there is a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial. Hill v.Lockhart (1985), 474 U.S. 52, 59.
In the case at bar, appellant alleged in his petition that he agreed to plead guilty to the charges only because his counsel coerced him into entering the pleas on the basis of false misrepresentations about the strength of the state's case. In the alternative, appellant contended that counsel was deficient in failing to investigate whether the state actually intended to call Bartlett as a witness.
The various evidentiary materials which appellant attached to his petition reveal the following pertinent facts.[1]
Bartlett was a long-time friend of appellant. Later in the day that the shootings occurred, appellant, Bartlett, and another friend, Koch were in a vehicle that was stopped by the police. Bartlett was driving and apparently had an open container of alcohol in the car at the time. Bartlett also maintained that he was heavily intoxicated.
The three were taken to the police station for questioning. Although Bartlett was told he was not under arrest, Bartlett was handcuffed, threatened with imprisonment and questioned extensively about any knowledge he had concerning appellant's involvement in the shootings at the Serafino residence. During this recorded interrogation, Bartlett made statements to the effect that appellant told him: "We did it last night," "I killed somebody," and "It was a rush."
The various affidavits allege that shortly before the scheduled trial date of September 3, 1996, appellant's defense counsel played the audiotape of Bartlett's interrogation by the police. They became concerned about the incriminating statements that Bartlett attributed to appellant. As a result, defense counsel met with appellant and strongly recommended that he accept a plea bargain. Appellant's father and appellant's court-appointed investigator believed appellant was innocent and did not want appellant to plea bargain. Appellant similarly did not want to plea bargain. Appellant's father asked counsel to request a continuance but counsel indicated that they did not believe the trial court would grant one.
Appellant's father insisted to the two defense attorneys that Bartlett was heavily intoxicated when he made the statement to the police. To investigate the matter, he telephoned Bartlett on a speakerphone in the presence of the two attorneys. Bartlett, who was living in Florida at that time, denied that appellant told him anything about the shootings and admitted that he was intoxicated at the time of the statement. During this discussion of strategy, appellant also denied telling Bartlett anything about the shootings. Appellant's father was also willing to pay for the costs of bringing Bartlett to Ohio to testify.
Appellant's submissions indicated that, nevertheless, counsel continued to recommend strongly that appellant accept a plea bargain on the basis that it was too risky to go to trial. Counsel also asked the investigator to recommend the same to appellant. Late on the night before the scheduled trial date, one of appellant's two defense counsel met with appellant and told him that if he didn't consider a plea bargain, "he could go to the electric chair." Appellant's father informed counsel that he no longer wanted him to represent his son. Counsel asked appellant and his father to reserve judgment on the issue until they heard counsel's latest discovery.
Appellant's submissions claim that counsel then informed appellant and his father that he "didn't like the way the witnesses were testifying in the Jason Getsy trial" and that appellant had no credible witnesses in his behalf. His materials state that counsel also said that the two prosecutors assigned to the case "told him that they contacted Matt Bartlett and said he was going to testify in court word for word just like his statement he gave to the police." Allegedly, counsel then informed appellant that he had negotiated a deal with the prosecution whereby the death penalty and firearm specifications would be dropped and where he would get twenty years to life with parole eligibility in thirteen and a half years.
Appellant's father then suggested that appellant consider the plea bargain. It is claimed that after appellant heard that his long-time friend was willing to testify against him, he decided that a plea bargain was "the only logical choice."
At the plea hearing, the trial court specifically asked appellant if he was satisfied with his legal representation. Appellant answered in the affirmative and did not raise any issue with regards to Bartlett or that he was coerced into entering his pleas. Nor did he protest his innocence when his attorneys acknowledged his involvement and responsibility.
Approximately one week after the hearing, Bartlett drove from Florida to Ohio of his own volition to speak with appellant's representatives. Appellant's investigator played the audiotape of Bartlett's interrogation and asked Bartlett if the statements he made were accurate. Bartlett indicated that appellant never expressly told him that he killed someone, and that Bartlett was simply hypothesizing as to what appellant may have done, based on his knowledge that shootings occurred at the Serafino residence and that appellant told him: "We did something last night." Bartlett further indicated that no one from the prosecutor's office ever contacted him about testifying against appellant.
In his petition for postconviction relief, appellant argued that the above factors indicate that his attorneys were deficient in one of two ways. First, appellant suggests that defense counsel may have lied to him when he indicated that the prosecution had contacted Bartlett and that Bartlett would testify as he did in the audiotaped interrogation. In the alternative, appellant suggests that even if the prosecution lied to counsel about Bartlett's testimony, and defense counsel was unwittingly repeating false information, defense counsel had an obligation to investigate the matter and not simply relay the information to appellant. On this point, appellant points to the absence of a subpoena mandating Bartlett's presence at trial to suggest that counsel should have known of the falsity of the prosecutions' representations.[2]
Both of these arguments are without merit. First, there is no evidence in the record before this court to suggest that defense counsel deliberately fabricated the story.[3] Thus, appellant failed to meet his burden of proof in regard to deliberate misconduct. Consequently, he is not entitled to an evidentiary hearing or other relief on the same. Moreover, appellant has not alleged any deprivation of his constitutional rights due to alleged prosecutorial misconduct, so we decline to delve into the same.
Second, there is no evidence in the record to suggest that counsel was deficient in informing appellant that the prosecution intended to call Bartlett as a witness and that the prosecution believed Bartlett would testify as he did in the audiotaped interrogation. Although it is true that the record contains no subpoena for Bartlett, the state did not file any subpoenas for the upcoming trial. This does not mean, however, that the state could not or would not subpoena Bartlett if a plea agreement could not be worked out prior to trial. Indeed, the state indicated at the plea hearing that it intended to call Bartlett to the stand had a plea agreement not been reached.[4] As to Bartlett's presence in Florida, there is no indication that the state was aware that he had left the area and would be more difficult to secure.
Further, contrary to appellant's assertions in his appellate brief, the record reveals that this is not a situation where counsel blindly accepted the state's representations about a particular witness' testimony without conducting any investigation of his or her own. Indeed, appellant's own evidentiary materials establish that, as a result of the phone call by appellant's father, counsel knew that Bartlett claimed he was not willing torepeat or endorse his previous statement verbatim should he be called to testify at appellant's trial.
The record is consistent with the notion that Bartlett changed his story every time someone talked with him. At best, defense counsel had to assume that no one knew for sure what Bartlett would say if he were called.
Nevertheless, it is apparent that counsel believed that it was in appellant's best interest to enter a plea, irrespective of whether Bartlett was willing to recant his prior statement to the police.[5] Indeed, appellant's own materials establish that there were other factors influencing counsel's recommendation that appellant plead guilty to the charges, beyond the issue of Bartlett's testimony.
Specifically, at the time the decision making was taking place, the trial of appellant's alleged co-conspirator, Getsy, was taking place. Apparently, the state's witnesses were well received as Getsy was ultimately convicted and sentenced to death. See Statev. Getsy (1998), 84 Ohio St.3d 180.
Counsel communicated his concerns about the testimony of the witnesses at co-defendant Getsy's trial and the fact that appellant did not have any credible witnesses to support his version of events. Nothing in the record belies these concerns, including appellant's affidavits in support of his petition.
Thus, while Bartlett's presence at trial may or may not have been damning, his testimony would have been a very small item in a rather extensive array of evidence available to the state. Despite defense counsel's contradictory comments at the plea hearing, counsel appeared to acknowledge that the defense had no winning strategies to pursue at trial.
In its comments to the court, counsel admitted that appellant participated in the events at issue and accepted responsibility for his actions. At the same time, defense counsel indicated that certain factual disputes remained. For example, did appellant act as a lookout and did he make the incriminating comments attributed to him the next day? When viewed in context, however, the comments addressed the degree of involvement, rather than a claim of no involvement.
The text of appellant's postconviction petition as well as defense counsel's comments at the plea hearing suggest that appellant intended to argue a duress theory of defense had the matter proceeded to trial. Specifically, appellant would claim that Santine exerted such control over him and instilled such fear in him that he was coerced and compelled to participate in the events of that night against his will.
Besides the fact that the duress theory was in complete opposition to the earlier defense theory in which appellant completely denied certain actions attributed to him, "[d]uress cannot be asserted as a defense to aggravated murder under R.C.2903.01(A)." Getsy at syllabus.
In summary, there is no reason to believe that counsel was deficient for recommending that appellant accept the plea bargain offered to him. Moreover, appellant's claim that he would not have otherwise pled guilty is simply not supported by the uncontroverted facts of this case.
The record before this court supports the trial court's conclusion that appellant received the effective assistance of counsel. As previously indicated, counsel zealously sought discovery in preparation for trial and otherwise diligently defended appellant's interests during the pre-trial proceedings. By virtue of the negotiated plea agreement, appellant avoided the death penalty; two counts were dropped; the firearm specifications were dropped and appellant received concurrent sentences. The sentencing court acknowledged the same at appellant's plea hearing, indicating to appellant that two "highly qualified" attorneys represented him.
In light of the foregoing analysis, appellant's three assignments of error are without merit. The judgment of the trial court is affirmed.
 ___________________________________________ PRESIDING JUDGE JUDITH A. CHRISTLEY
NADER, J., O'NEILL, J., concur.
[1] Attached to the petition were: (1) affidavits from appellant, Matt Bartlett, co-defendant Jason Getsy, appellant's father and appellant's court-appointed investigator; (2) two legal briefs from the state suggesting that it believed appellant's defense counsel was filing frivolous motions in appellant's behalf; (3) a typed statement of Bartlett's audiotaped interrogation by the police and a typed statement of Bartlett's statement to appellant's investigator after the plea hearing; and, (4) a statement from a consultant/retired FBI agent indicating that the consultant believed appellant was innocent and that appellant had been denied the right to a fair trial.
[2] At no point in his argumentation in support of his petition does appellant allege prosecutorial misconduct. Rather, the argumentation is more to the effect that his counsel should have considered the possibility that the prosecutor lied.
[3] In appellant's father's affidavit, the father indicated that he believed that either appellant's counsel or the prosecutors or both were lying about Bartlett testifying at trial, because Bartlett informed him that the prosecution never contacted him. This conclusory statement is not the type of evidence which establishes the existence of a genuine issue of fact entitling appellant to a hearing on his petition. It was merely the father's personal opinion as to what explained the discrepancies over whether Bartlett would testify, and, as such, had no evidentiary value.
[4] The record does not contain a witness list from the state.
[5] We note that it is difficult to predict whether the state would have been able to impeach Bartlett at trial if he testified to his new version of events as recited to appellant and his counsel. See Evid.R. 607 which provides that a party may only use a prior inconsistent statement from its own witness to impeach the credibility of that witness upon a showing of surprise and affirmative damage.